# *EXHIBIT A*

# *EXHIBIT A*

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

| | |
|---|---|
| **NOTICE TO DEFENDANT:** *(AVISO AL DEMANDADO):* Daniel Cornish, Cosential, a Delaware corporation, Cosential Ops Cosential Entities, JMI, a California Corporation, Does 1-100 | **FOR COURT USE ONLY** *(SOLO PARA USO DE LA CORTE)* |
| **YOU ARE BEING SUED BY PLAINTIFF:** *(LO ESTÁ DEMANDANDO EL DEMANDANTE):* Michael Cornish Kyle Cornish | |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* 330 West Broadway San Diego CA 92101 | CASE NUMBER: *(Número del Caso):* **37-2019-00019692-CU-FR-CTL** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

John Michael Jensen, 11500 West Olympic Blvd #550 Los Angeles CA 90064 (310) 312-1100

| DATE: April 22, 2019 *(Fecha)* | Clerk, by *(Secretario)* | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

EXHIBIT

-8-

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| John Michael Jensen SBN 176813<br>Law Offices of John Michael Jensen<br>11500 West Olympic Blvd Suite 550<br>Los Angeles CA 90064 | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**04/16/2019** at 11:05:51 AM<br><br>Clerk of the Superior Court<br>By Melinda McClure,Deputy Clerk |

TELEPHONE NO.: 310-312-1100   FAX NO.:

ATTORNEY FOR *(Name)*: Michael Cornish

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego Hall of Justice Courthouse
STREET ADDRESS: 330 West BroadwaySan Diego, CA 92101
MAILING ADDRESS: 330 West BroadwaySan Diego, CA 92101
CITY AND ZIP CODE: 330 West BroadwaySan Diego, CA 92101
BRANCH NAME: Hall of Justice Courthouse

CASE NAME:
Michael, KyleCornish, v. Dan Cornish, Cosential, JMI Equity,Does 1-100

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ **Limited**<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ **Counter**   ☐ **Joinder**<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 37-2019-00019692-CU-FR-CTL |
| | | | JUDGE: | Judge Richard E. L. Strauss |
| | | | DEPT: | |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| ☐ Auto (22) | ☑ Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400–3.403)** |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | ☐ Other collections (09) | ☐ Construction defect (10) |
| **Damage/Wrongful Death) Tort** | ☐ Insurance coverage (18) | ☐ Mass tort (40) |
| ☐ Asbestos (04) | ☐ Other contract (37) | ☐ Securities litigation (28) |
| ☐ Product liability (24) | **Real Property** | ☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45) | ☐ Eminent domain/Inverse | ☐ Insurance coverage claims arising from the |
| ☐ Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | types (41) |
| ☐ Business tort/unfair business practice (07) | ☐ Other real property (26) | **Enforcement of Judgment** |
| ☐ Civil rights (08) | **Unlawful Detainer** | ☐ Enforcement of judgment (20) |
| ☐ Defamation (13) | ☐ Commercial (31) | **Miscellaneous Civil Complaint** |
| ☑ Fraud (16) | ☐ Residential (32) | ☐ RICO (27) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | ☑ Other complaint *(not specified above)* (42) |
| ☐ Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Partnership and corporate governance (21) |
| **Employment** | ☐ Petition re: arbitration award (11) | ☐ Other petition *(not specified above)* (43) |
| ☑ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☐ is   ☑ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties         d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel     e. ☐ Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve                in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence              f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify)*: 17 (seventeen)
5. This case ☐ is   ☑ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. *(You may use form CM-015.)*

Date: April 16, 2019
John Michael Jensen
(TYPE OR PRINT NAME)                              ▶        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |

Exhibit A

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
 Asbestos Property Damage
 Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
 Medical Malpractice– Physicians & Surgeons
 Other Professional Health Care Malpractice
Other PI/PD/WD (23)
 Premises Liability (e.g., slip and fall)
 Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
 Intentional Infliction of Emotional Distress
 Negligent Infliction of Emotional Distress
 Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
 Legal Malpractice
 Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
 Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
 Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
 Negligent Breach of Contract/ Warranty
 Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
 Collection Case–Seller Plaintiff
 Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
 Auto Subrogation
 Other Coverage
Other Contract (37)
 Contractual Fraud
 Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
 Writ of Possession of Real Property
 Mortgage Foreclosure
 Quiet Title
 Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
 Writ–Administrative Mandamus
 Writ–Mandamus on Limited Court Case Matter
 Writ–Other Limited Court Case Review
Other Judicial Review (39)
 Review of Health Officer Order
 Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
 Abstract of Judgment (Out of County)
 Confession of Judgment *(non-domestic relations)*
 Sister State Judgment
 Administrative Agency Award *(not unpaid taxes)*
 Petition/Certification of Entry of Judgment on Unpaid Taxes
 Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
 Declaratory Relief Only
 Injunctive Relief Only *(non-harassment)*
 Mechanics Lien
 Other Commercial Complaint Case *(non-tort/non-complex)*
 Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
 Civil Harassment
 Workplace Violence
 Elder/Dependent Adult Abuse
 Election Contest
 Petition for Name Change
 Petition for Relief From Late Claim
 Other Civil Petition

**CIVIL CASE COVER SHEET**

Exhibit A

-10-

John Michael Jensen (SBN 176813)
LAW OFFICES OF JOHN MICHAEL JENSEN
11500 West Olympic Boulevard, Suite 550
Los Angeles, CA 90064
Telephone: (310) 312-1100
Email: johnjensen@johnmjensen.com

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**04/16/2019** at 11:05:51 AM

Clerk of the Superior Court
By Melinda McClure, Deputy Clerk

Attorneys for Michael Cornish, Kyle Cornish

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| MICHAEL CORNISH, KYLE CORNISH, <br><br> Plaintiffs <br><br> vs. <br><br> DANIEL CORNISH, COSENTIAL a Delaware corporation, COSENTIAL OPS COSENTIAL ENTITIES, JMI, a California corporation, DOES 1-100, <br><br> Defendants. | ) Case No.:  37-2019-00019692-CU-FR-CTL <br> ) <br> ) <br> ) **COMPLAINT FOR FRAUD, BREACH OF** <br> ) **FIDUCIARY DUTIES, BREACH OF** <br> ) **COVENANT OF GOOD FAITH AND** <br> ) **FAIR DEALING, BREACH OF WRITTEN** <br> ) **CONTRACT, NEGLIGENT** <br> ) **MISREPRESENTATION, NEGLIGENCE,** <br> ) **CONSTRUCTIVE FRAUD, LABOR** <br> ) **CODE VIOLATIONS, CORPORATION** <br> ) **CODE VIOLATIONS, RESCISSION,** <br> ) **RESTITUTION, IMPROPER GIFT OF** <br> ) **COMMUNITY PROPERTY** <br> ) <br> ) Date: _____ 2019 <br> ) Time: 10:00 am <br> ) Department: <br> ) <br> ) Action filed: _____ 2019 |

Plaintiff Michael ("Mike") Cornish and his spouse Kyle Cornish, by and through their attorneys, based on their own experience and investigation and the independent investigation of counsel and information and belief, allege against defendants Daniel ("Dan") Cornish, Cosential Inc., a Delaware Corporation ("Cosential") and JMI Equity ("JMI"), as follows:

- 1 -

Exhibit A

-11-

# **INTRODUCTION**

1.      Dan Cornish is CEO and founder of a small software company, Cosential Inc. Mike Cornish is Dan's younger brother.

2.      In 2000, Dan sought Mike to invest in his new company. Mike Cornish and his spouse Kyle Cornish initially invested one million two hundred fifty thousand dollars ($1,250,000) in Cosential for 7,943,960 shares of Series B Preferred Stock and 175,056 shares of Common Stock. While Cosential did not send the stock shares certificates to Mike and Kyle, Mike and Kyle were (or should have been) the registered owners of Stock Certificate No. 10 for 7,943,960 Series B Preferred shares and Stock Certificate No. 14 for the common shares. These Certificates were confirmed by Cosential in May of 2018.

3.      At the time of the investment, Dan and Cosential also entered into various written agreements with stockholders (Certificate of Incorporation, Stockholders' Agreement[1], Rights Agreement, Certificate of Designation, ROFR's, Appraisal Rights, Voting Rights,  and other agreements) that required among other things, that Dan and Cosential provide each Preferred stockholder with appraisal rights, special voting rights,  first rights of refusal, liquidation, accrued dividends, evaluation, and other rights in certain events, including if the company or insiders bought shares, merged, reorganized or took other action.

4.      As examples, one of the terms required consent of two thirds of Series B Preferred Stockholders to effect a Merger. Another term, Section 5(b) of the Certificate of Designation provided that, so long as Series B Preferred Stock remain outstanding, the Company shall not effect any Liquidation without the approval (by vote or written consent) of the holders of at least two-thirds of the shares of Series B Preferred Stock then outstanding, voting together as a single class (the "Series B Vote").

5.      These written Agreements remained in effect since Cosential's formation.

6.      After the original investment in 2000, Mike and Kyle owned twenty two and seven tenths percent (22.7%) of the outstanding Series B Preferred shares. Dan owned 49.5 % of

---

[1] Mike does not presently have a copy of the Stockholders Agreement (it was not sent or transferred to him), and is making good faith efforts to obtain the Stockholder's Agreement.

Complaint

Exhibit A

-12-

the Series B Preferred shares. Mike and Kyle also owned a smaller amount of the Common Stock.

7.      In the time frame of 2002-2008 Dan was often threatened with various proxy fights and allegations of mismanagement from Silicon Venture Partners and/or Alpha Ventures (Steve Brotman), another one of Cosential's original shareholders. To fight off these threatened proxy battles, Dan requested that Mike purchase additional Preferred and common shares in Cosential from Silicon Venture Partners and/or Alpha Ventures. Dan said he wanted the shares in Mike's hands so he could prevent any proxy fights since Mike and Dan were close at the time. Mike and Kyle invested another $250,000 (to buy out Brotman's ownership stake) for a total investment in Cosential Preferred Stock and common stock of $1,500,000. No additional stock shares certificates were sent to Mike and Kyle. However in an email dated 2013, Dan acknowledged that Mike invested in Cosential for the Brotman shares.

8.      From 2001 to 2018, Cosential never paid dividends although dividends did accrue through the preferred share structure. Dan and Cosential did not disclose or send any financial information to Mike or Kyle. Dan paid lip-service to Mike's requests for the financial status of the company but Dan did not send any documents or financial information about Cosential to Mike or Kyle.

9.      Whether accurately or not, Dan often complained that Cosential was in financial trouble and may not survive. Loans had to be taken out to make payroll, and Cosential's existence was in jeopardy as technology companies only survive if the engineers were working.

10.      From time to time, Dan would hint that investment bankers were interested in his company because Cosential was in a hot technological sector with Microsoft, Oracle and Salesforce.com. Dan often said he would never sell out. However, in 2017 and possibly before, Dan began to receive serious inquiries regarding potential large investments and/or potential acquisition transactions involving Cosential. Dan did not tell Mike.

11.      In late 2017 or early 2018, Dan received a private offer of a $32 million investment for 50% ownership in Cosential, with Dan controlling and owning the other 50% of Cosential. It valued Cosential at over $50 to $60 million.

Complaint

Exhibit A
-13-

12.     Dan did not tell Mike, even though a merger or reorganization would require Mike to consent as Mike still owned 7,943,960 Series B Preferred shares or about 22.7 %. Dan owned approximately 49.5 %. (Dan did not own over 2/3 of the Preferred shares that was necessary to consent to a merger without a Vote.)

13.     In late 2017 or early 2018, Dan and/or Cosential reached an agreement in principal with JMI such that Dan knew that each Preferred Share of Cosential had a value of about $1.12 - $1.17 per share. Dan knew that Mike and Kyle's 7,943,960 shares of Series B Preferred Stock were worth about $9,135,554.

14.     Instead of informing his brother Mike about any of the inquires including this specific one, the JMI  investment and stock offer, Dan sought to defraud his brother Mike out of Mike's Series B Preferred Stock in Cosential. Dan sought to gain Mike and Kyle's now valuable Cosential shares for himself to sell to JMI, the proposed new investor, for Dan's private profit. Dan also wanted to gain the extremely valuable voting power that the Preferred B shares had. Dan had possibly other motives as well in addition to these obvious ones.

15.     Dan misled, lied, misinformed and withheld this information from Mike to gain Mike and Kyle's stock for free or vastly below market.

16.     Dan also likely sought furtively to get Mike and Kyle's Series B Preferred Stock so that Dan would have more than 2/3 of the outstanding amount of Series B Preferred shares and did not need to get approval or consent from any other shareholders for the merger, "liquidation", reorganization, consolidation, or acquisition.

17.     On information and belief, JMI knew or should have known that Mike owned a significant amount of the Series B Preferred Stock in Cosential that JMI proposed to acquire.

18.     The plan to get Mike's Series B Preferred shares was brazen, menacing, fraudulent, in violation of numerous contractual and Statutory laws and fairly sophisticated. It focused on Mike's vulnerability as a Cosential employee.

19.     To establish a false pretense for Dan to gain Mike's stock for himself at low or no cost, Dan misrepresented and lied to Mike that Cosential was in financial distress, the company

could be worthless, and would fail without outside investment. Dan's exact words to Mike were quote "I'm sick of being out of money" and Cosential needed this deal "to survive".

20.     On the false basis that Cosential was out of money and was going under, Dan threatened Mike with the loss of his Cosential job and the loss of his only income and 98% of Mike and Kyle's community property unless Mike signed a "Stock Ownership Agreement" ("SOA") that purported to release and waive Mike and Kyle's rights to 95% of their Preferred stock that were putatively worthless as the company was failing.

21.     Misrepresenting the company's financing, financial conditions and prospects, Dan fraudulently induced Mike to sign a "Stock Ownership Agreement" (SOA) that falsely stated that Mike previously sold 5,298,800 shares of Series B Preferred Stock by purported agreement dated March 8, 2011, and additionally "recognize" a purported subsequent transfer of 2,222,907 shares of Series B Preferred Stock.

22.     In actual fact, neither sale nor transfer ever happened (and therefore was not documented). There were no oral or written agreements to transfer any shares at that time. The first disputed transaction was reported to have happen on a specific date with a specific volume but without a price or any paper trail. In multiple transactions after the first one, and in a brazen show of "in your face"power , the disputed and fraudulently induced SOA admits the purported sales of 2,222,907 shares, "that happened from time to time following the initial sale "... "was never formally documented". No date, no volume, and apparently no price were ever documented.

23.     As further evidence that the prior putative sales did not occur, Cosential and/or Dan was in possession of Stock Certificate #10 for 7,943,960 Series B Preferred shares in May 2018. This was the Series B Preferred shares certificate registered to Mike and Kyle at the company's formation. As further evidence that these prior putative sales did not occur, the protocols necessary for the trading of shares were not observed as well including IRS tax documents and disclosures.

24.     Dan knew that he had immense power over Mike, including as his employer and corporate insider. Dan knew or had strong reasons to expect that Mike would believe what Dan

Complaint

Exhibit A
-15-

said, that Mike would rely on him, and that Mike would sign the "Stock Ownership Agreement" as demanded on the same day sent. Dan knew Mike was in economic trouble. Previously, Mike told Dan that Mike relied on the Cosential salary. Dan likely knew that Mike would sign the "Stock Ownership Agreement" if Mike believed that stock was worthless and he was threatened with losing his Cosential salary that was his only income to support his wife and six children.

25.     Procedurally, Dan deceitfully compelled Mike to sign the Stock Ownership Agreement the same day that Dan sent it (without any previous disclosures or drafts). Dan would not let Mike have an attorney review it.

26.

27.     Through the fraudulent "Stock Ownership Agreement", Dan obtained 70.1% of Preferred B shares so he did not need consent of other shareholders. No one could stop merger. Quoting from the June 4th 2018 Disclosure document that was concealed from Mike, Mr."[Daniel]Cornish owns approximately 66.20% of the Company's Common Stock and approximately 70.01% of the Company's Series B Preferred Stock. The consent of the Requisite Stockholders will represent the only consents of the holders of any class or series of Cosential capital stock necessary to adopt the Merger Agreement and approve the Merger and related matters". A new stock certificate was created in May 2018.

28.     Ignorant of the new valuations and without any basis to gain that information, Mike reasonably relied on Dan's representations, including Dan's assertion of nonpublic information that the company was failing. Reasonably relying on the special relationships with Dan as his boss, brother, Cosential CEO, Cosential President, Treasurer, Director, Cosential significant stockholder, and corporate insider, Mike had no reason to suspect that Dan was making false representations.

29.     At the time that Dan presented him with the "Stock Ownership Agreement", Mike believed Dan that the Cosential company was failing and the stock would be worthless. Mike had no reason to suspect that Dan was lying that Cosential was in immediate financial jeopardy (and the shares were worthless). Mike had no reason to believe that Dan was lying that the only way

Complaint

Exhibit A
-16-

to save the company and to save his salary was to immediately sign the nonnegotiable Stock Ownership Agreement.

30.     Mike's reliance on Dan was reasonable. Mike knew that Cosential had been in financial jeopardy in the past. In years past, Mike had helped Dan by investing more money in Cosential to keep Cosential solvent but Mike could not afford to make any further investment. From hearing Dan's complaints, Mike knew that the company had to take loans to make payroll in the past, and the company reasonably could be worthless, especially if it could not make its payroll and retain its engineers and employees.

31.     From his unlawful acts, Dan Cornish kept, converted,  or transferred Mike's shares and their sales proceeds, and/or otherwise caused Mike to lose at least $8,424,311.84 plus interest  in money or stock, significant voting power, as well as a percentage ownership in a valuable software company that was projected to greatly increase in value due to the cash infusion and investment by JMI.

32.     In addition, Mike was also an employee of Cosential in California from about 2015 until November 2018.

33.     Mike had a verbal employment contract with Dan and Cosential, confirmed in multiple phone calls in August and September and referenced in an email in November of 2018 that Cosential would pay Mike his salary through at least through the end of 2018. Mike continued to work for Dan and Cosential after signing the disputed and fraudulently induced SOA. However, in October 2018, at the behest and direction of JMI, Dan discharged and terminated Mike in violation of the employment agreement, breaching the oral agreement. The November email said." I had a direct order from JMI that I am not to pay you anymore. No negotiation. I will have to send you money personally.  I will let you know what I can do. "

34.     As a result of the breach of the employment agreement and non-payment of wages, Cosential also failed to pay Mike's wages in an amount more than $25,000 for November and December 2018. In addition, in further violations of the employment agreement, Cosential and Dan failed to pay Mike the earned and unused vacation and sick pay at the time that the October 7th pay period fell due.

35.   Mike seeks rescission of the "Stock Ownership Agreement", any prior putative "sales", restitution, and/or in the alternative damages of $60 million, which would be the fair market value of the stock wrongly transferred (after JMI's investment). Mike also seeks the salary amounts owed in Dan's and Cosential and JMI's violation of the employment agreement, and all other relief and recovery sought in this Complaint.

36.   Pursuant to the provisions of Corp. Code § 25502, Mike Cornish and Kyle Cornish are entitled to recover damages from Dan Cornish in an amount equal to the difference between the price at which the Series B Preferred securities were sold and the market value which the securities would have had at the time of the putative sale, transfer, acquisition if the information known to defendant had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information, plus interest at the legal rate.

37.   Pursuant to Corp. Code § 25502.5, Mike Cornish and Kyle Cornish are entitled to recover damages from defendants in an amount equal to three times the difference between the price at which the securities were sold and the market value which the securities would have had at the time of the transfer if the information known to Dan Cornish had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

38.   Pursuant to the provisions of Corp. Code § 25502.5, Mike Cornish is also entitled to recover from defendant reasonable costs and attorney's fees in this action.

39.   Mike's spouse, Kyle Cornish, also independently seeks rescission and restitution of the putative transfer or "sales" of Cosential shares that were community property and purportedly transferred under the disputed SOA as a gift or below reasonable value, and all other relief and recovery sought in this Complaint.

Exhibit A
-18-

## **PARTIES**

### **A Plaintiffs**

40.     Mike Cornish is an individual who resides and has resided in San Diego County, California since July 2016. Cosential employed Mike at his principal residence in San Diego County California since 2016.

41.     Mike and Kyle were married in Danbury CT in 1993, and held many assets including the Cosential stock as community property.

42.     Kyle Cornish, Mike's spouse and holder of community property in the Cosential shares, resides with Mike in San Diego County California.

43.     Michael and Kyle Cornish alternatively brings this action on behalf of Cosential, the issuer of the security described in this Complaint.

### **B. Defendants**

44.     Dan Cornish is a resident of Austin Texas.

45.     At all times mentioned in this complaint, Dan Cornish was chief executive officer, corporate insider, and controlling person of Cosential who's relationship to Cosential gave Dan Cornish access to inside information of Cosential. As a result of that relationship, Dan Cornish had access to material information about Cosential that would significantly affect the market price of its securities, was not generally available to the public, and which Dan Cornish knew was not intended to be available to the public.

46.     JMI is an investment fund with an office and principal place of business located in San Diego California.

47.     At the specific times mentioned in this complaint, JMI and its employees were corporate insider, and controlling entity of Cosential who relationship to Cosential gave JMI and its agents and employees access to inside information of Cosential. As a result of that relationship, JMI and its employees and agents had access to material information about Cosential would significantly affect the market price of its securities, was not generally available to the public, and which JMI and its employees and agents knew was not intended to be available to the public.

Complaint

Exhibit A
-19-

48.     Cosential Inc. is a company incorporated under the law of the state of Delaware with its principal place of business at 610 W 5th St. #604 in Austin Texas. Cosential employed Mike Cornish at his various San Diego County, California residences that he had been renting since moving permanently to California in July 2016. Cosential has clients and customers in California. Cosential has regular contact and does business in California.

**C. Doe Defendants**

49.     The Cosential entities include a multitude of subsidiaries, investment vehicles and affiliated companies.

50.     Top officers, employees, and board members of Cosential, maintain an interest and control over all or part of Cosential.

51.     Top officers, employees, and board members of JMI, maintain an interest and control over all or part of JMI and/or Cosential.

52.     Plaintiffs are presently unable to confirm and identify which of the other entities and/or persons are liable for the claims asserted herein. Discovery will allow Plaintiffs to proceed with naming additional Defendants. Other persons and entities, DOES 50-100 whose identities are presently unknown to Plaintiffs, participated in the events alleged herein which give rise to the claims asserted by Plaintiffs.

**D. Agents and Co-Conspirators.**

53.     At the specific times mentioned herein, each of the Defendants above was the agent, servant, employee, partner, alter ego, aider and abettor, co-conspirator and/or joint venturer of each of the remaining Defendants named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, and/or joint venture, and each Defendant has ratified and approved the acts of each of the remaining defendants.

**JURISDICTION AND VENUE**

54.     Jurisdiction over JMI, Dan Cornish, Cosential and the other persons and entities is proper in San Diego CA, including under California Code of Civil Procedure Section 410.10.

Complaint

Exhibit A

-20-

55.     This Court has general personal jurisdiction over Cosential because it has had substantial and continuous business contacts with California, it is qualified to do business here and the Plaintiffs who are damaged by its actions are residents of San Diego County. In addition, Cosential employed Mike Cornish in California. Kyle and Mike are residents of San Diego County, California.

56.     This Court has general personal jurisdiction over JMI Equity because it has had substantial and continuous business contacts with California (including its principal office where the Cosential Merger was formulated and signed), it is qualified to do business here and Plaintiffs who are damaged by defendants' actions are residents of San Diego County.

57.     This Court has general personal jurisdiction over Dan Cornish as he has had substantial and continuous business contacts with California (including in undertaking the Cosential merger in California with a California business), he is qualified to do business here and Plaintiffs who are damaged by Defendant's actions are residents of San Diego County. Dan's fraudulent activity occurred in San Diego County, CA (except those described herein as occurring outside California). When Dan undertook the fraudulent actions or omissions in 2016 through 2019 as described in this Complaint, Mike and Kyle were residents of California.

58.     The value of the matter at issue exceeds $25,000, involves stock and property that were located in San Diego California, involves community property rights, involves breach of fiduciary duty claims, and the Superior Court in the state of California, County of San Diego has jurisdiction and proper venue.

59.     While the disputed and fraudulently induced "Stock Ownership Agreement" has venue and jurisdiction clauses, these purported contract terms were an integral part of the fraudulent scheme to deny Mike and Kyle their stock, their investment, their voting power, and the causes of action and right to relief to recover the stock. The venue and jurisdiction clauses purport to transfer jurisdiction to external courts and use Texas law which would negate valuable causes of action under California state law that are not available, significantly different or not viable under Texas state law. Unlike California, Texas law does not provide for some of a cause of action allowing for recovery for Mike and Kyle in these circumstances, including negating

Complaint

Exhibit A
-21-

causes of action against a majority shareholder who withheld information on a merger and self-dealing, breach of fiduciary duty, violation of the duties of good faith and fair dealing and other valuable claims. Mike also asserts Unfair Competition claims and various Ca. labor code violations as an employee in California where Texas does not provide a similar remedy. Kyle, independently asserts claims for an improper gift or unreasonable sale of community property without her written consent under California law, which are not available under Texas state law. If the disputed and fraudulently induced jurisdiction and choice of law clauses of the fraudulently induced SOA are upheld, Mike and Kyle would be fraudulently denied relief as each is not allowed the benefit of California law. Denying Kyle and Mike Cornish the right to the substantive law of California because of a fraudulently induced agreement when each is a California resident would be contrary to law, prudence, and public policy.

## **FACTUAL ALLEGATIONS**

60.     Dan Cornish is two years older than his brother Mike Cornish. They grew up together in Belle Terre, NY and started their business in Wilton, Connecticut. Mike was a founding member of Cosential.  Mike Cornish alleges that Dan has regularly intimidated Mike including repeatedly overwhelming Mike's ability to independently make important decisions.

61.     In earlier years, Mike was a successful investor and commodity trader. Dan was a struggling software engineer.

62.     In about 2000, Dan approached his brother Mike about investing money in a new software startup that Dan was hoping to incorporate originally called "Design Architecture", and later named  Cosential. The software helped architects and those in the construction and engineering business communicate with each other. Mike was not familiar with either software or the construction business. While Mike was wary of Dan's bullying, Mike saw the potential commercial opportunity and agreed to invest in common stock and preferred stock of the new Cosential business as a founding member. A new corporation formed under Delaware law called Cosential.

- 12 -

Exhibit A

-22-

63.     Mike Cornish and his spouse Kyle Cornish invested one million two hundred fifty thousand dollars ($1,250,000) in Cosential for 7,943,960 shares of Series B Preferred Stock and 175,056 shares of Common Stock. While Cosential did not send the stock shares certificates to Mike and Kyle, Mike and Kyle were (or should have been) the registered owners of Stock Certificate No. 10 for 7,943,960 Series B Preferred shares and Stock Certificate No. 14 for the common shares. Such was later acknowledged by Cosential in their fraudulent SOA dated May 14th, 2018, in the first "Whereas" clause.

64.     As part of the prospective investment, Cosential entered into various Agreement containing various valuable protections for the stockholders, including appraisal and valuation rights upon a sale, merger, reorganization and other events. The Agreements also placed important limitations on Cosential and its corporate insiders.

65.     The various written agreements with stockholders include a Certificate of Incorporation, Stockholders' Agreement[2], Rights Agreement, Certificate of Designation, Stock Purchase Agreement and other agreements. Individually and severally, the agreements required among other things, that Dan and Cosential provide each Preferred stockholder with appraisal rights , important voting rights,  first right of refusal, liquidation, evaluation, dividends, and other rights in certain events, including if the company bought shares, merged, reorganized or took other action.

66.     As examples, one of the terms required consent of two thirds of Series B Preferred Stockholders to effect a Merger. Another term, Section 5(b) of the Certificate of Designation provided that, so long as Series B Preferred Stock remain outstanding, the Company shall not effect any Liquidation without the approval (by vote or written consent) of the holders of at least two-thirds of the shares of Series B Preferred Stock then outstanding, voting together as a single class (the "Series B Vote").

67.     These written Agreement remained in effect since Cosential's formation.

---

[2] Mike does not presently have a copy of the original Agreements (they were not sent or transferred to him), and is making good faith efforts to obtain the Agreements, and will provide them to the court when received. The Agreements are referred to in the Confidential documents filed under seal.

Complaint

68.     While Mike does not currently have a copy of the original Agreements, he is currently endeavoring to locate them and will provide them as soon as it is available. Some of the terms are referred to in the attached confidential document filed under seal.

69.     After the original investment in 2000, Mike owned 22.7% of the Series B Preferred shares. Dan owned 49.5 % of the Series B Preferred shares.

70.     Mike held the investment and the shares of Cosential as community property with his wife. Cosential never sent Mike or Kyle any stock certificates (until June of 2018 to effectuate the merger).

71.     At or about the same time, Dan approached Steve Brotman and his firm Silicon Alley LLP, about investing in Cosential. Brotman and Silicon Alley invested about $1 million and received about $700,000 in common stock and $300,000 in the Series B Preferred shares in Cosential.

72.     There were only a few other investors in Cosential at any time since 2002, and Cosential has always been a closed corporation.. Through all relevant time periods, Dan has always been a corporate insider and likely majority shareholder of Cosential Inc.

73.     From 2001 onward, Cosential did not disclose and did not send Mike or Kyle any financial disclosures. Cosential paid no dividends and did not  share in any profits.

74.     As founders, Dan and Mike decided to lease office space together at 15, Old Danbury Rd in Wilton Ct., where Cosential occupied 85% of the square feet and Mike's separate investing company occupied 15%. As an additional accommodation to his brother and Cosential, Mike deposited $110,000, the whole security deposit needed for a ten year lease and then paid $30,000 to improve the leasehold. Later, in 2002, Mike moved his office to his home residence in Ridgefield, CT. After Mike vacated his small share of the leasehold, Cosential remained as the sole occupant of the leasehold and took over full responsibility for the lease payments.

75.     In or about 2004 , Cosential vacated the premises at 15, Old Danbury Rd in Wilton, CT, breaching the lease, causing Mike to lose the $110,000 security deposit. Cosential moved to Austin Texas. Mike was never reimbursed for this deposit even though Dan agreed to take on that obligation after Mike left the space.

Complaint

Exhibit A

-24-

76.     In the 2000s, Mike was a successful investor and commodities trader. Mike was not shy about showing his financial success, and on occasion flew his brother Dan and Dan's wife and family on private planes on lavish vacations. Although Mike noticed that there was likely some resentment or jealousy in Dan or Dan's family against Mike and his family by Mike's ostentatious displays, Mike continued to try to help his brother Dan succeed in business for all of their benefits.

77.     In or about 2002 to 2008, Silicon Alley and its principal Steve Brotman challenged Dan on the management of Cosential. Dan turned to his brother Mike for investment funds to buy out Brotman's shares and to help save Cosential. As a brother and insider of the company, Dan came to Mike and asked Mike to invest more money in Cosential and buy out the preferred and common stock of Brotman.

78.     To help his brother and keep his investment in Cosential alive, Mike agreed and made an additional investment in Cosential of two hundred fifty thousand dollars ($250,000) for the purposes of acquiring and transferring the Series B Preferred shares and common shares owned by Brotman and Silicon Alley to the account of Mike and his wife. At this time, Mike agreed to invest more money to help keep Cosential "alive" in part because he had already invested a lot of money in Cosential. The money for this additional investment to buyout Brotman was sent by Mike's CFO at the time named Charlie Duffy from Mike's Chase bank account.

79.     In 2008, Silicon Alley and Broman recognized a loss of about 97% percent on his common shares, but the value of the Series B Preferred shares were discounted only 15%. Mike understood that Cosential took back the common and Preferred shares that Brotman/Silicon Alley once owned and then accounted and registered those shares in Mike and his wife Kyle's name, consistent with their transfer of the money. Although Dan and Cosential never sent Mike any share certificate or recognition that Mike now owned the Brotman/Silicon Alley shares, Mike and Kyle believed and understood that the "Brotman" shares were registered to him and his spouse. Dan and Mike would often discuss the Brotman shares verbally and in writing especially when Mike sought help from Dan later after Silicon Alley sold out of their shares. Dan wanted to

- 15 -

Exhibit A
-25-

purchase the shares from Mike and would offer discuss sending Mike money in return for those

Brotman shares that Mike bought out to help Dan when Brotman fought with Dan in the early

2000's.. In his typical bullying fashion, such as a October 25, 2013 email, Dan stated " *You do*

*not need to remind me about Brotman, I have sent you money when I could not afford it. I did*

*not pay my property taxes when I paid yours. Please do not go there again*" . Dan Cornish,

CEO, Cosential, d. 512-222-1529 c. 203-459-6348 dcornish@cosential.com

80.    .

81.    "

82.    From 2001 to 2018, neither Cosential nor Dan ever transmitted any financial

information to Mike about Cosential. Neither Dan nor Cosential sent Mike or Kyle any

accountings, annual reports, tax reports, or other financial documents, including even about the

Brotman/Silicon Alley LP shares. When the remaining Brotman shares were bought back over

time, Mike's ROFR rights and other rights were ignored.

83.    Throughout its existence, Cosential did not pay dividends or profit share

distributions to Mike or Kyle even though Mike's Preferred Share ownership was only slightly

under half of Dan's ownership of Preferred shares (22.7% vs 49.5%) even without the extra

Brotman shares that Mike and Kyle paid for.

84.    However, at various times, Dan said to Mike in emails and verbally that Cosential

was out of money, or won't survive, or similar dire warnings, often in a bullying manner.

85.    In between 2008 and 2012, Mike suffered heavy losses in his investments, as a

result of market downturns. His home in Connecticut and Vermont were foreclosed upon, and

now Mike was in precarious financial condition. He no longer had extra money to invest and

help keep Cosential afloat. In fact, the roles slightly reversed. During these period, Dan sent

Mike monies including a wire transfer of $30,000 or so, in the time period of late 2010 to mid-

2011 as a gift to assist his brother.  The disputed first stock sale was purported to take place on

March 8, 2011. Other than the $30K transfer in February of 2011, there were no other significant

transfers of money.There was informal communication about the potential of Mike selling back

the Brotman shares as compensation for the help that Dan offered. Dan sought these valuable

Complaint

Exhibit A

-26-

Brotman shares because they included Series B Preferred shares that Dan viewed as very valuable from a voting point of view. Dan sent emails trying to get these shares but never followed through on the required disclosures, appraisals or paper work because Mike demanded an appraisal for the Brotman Series B Preferred shares.. Mike and Dan did not agree to a price for the Brotman shares.  There were no formalized arrangements about this money, other than it was to help Mike in a difficult financial time, as Mike had six children, a wife, no income producing job, and limited avenues to earn income. The money Dan sent to Mike, as Dan has stated in the past, was a brother helping a brother in times of need, just like Mike did when Dan desperately needed help with a bailout when Brotman was threating a takeover of Cosential in the early 2000's or when Dan needed the entire Security deposit for the start up of the business. In written communication to Mike's family, Dan's family characterized the money that Dan sent Mike as gifts or help to Mike because of his difficult financial setbacks. At one point in 2016, Mike was asked to thank Dan for the help that he was giving Mike and his family.  Dan sending money to Mike would first be needed to cover that $110,000 loss of the security deposit and then the $250,000 for the Brotman shares plus interest  .

86.    After the fact, Dan alleged in 2018 that there was a purported stock purchase agreement in 2011 where Dan alleges that Mike sold 5,298,800 shares of Series B Preferred Stock by purported agreement dated March 8, 2011. The purported date was exact and the purported number of shares were exact. The price, consideration and payment data were omitted, making even the purported agreement illusory.

87.    Mike alleges that there was no Stock Purchase Agreement in 2011 and there were no financial transactions or other specific indications of any repurchase of any stock other than informal talk of Mike reselling the Brotman shares, and no sales of Series B Preferred Stock, much less 5,298,800 shares. At fair market value, 5,298,800 shares of Series B Preferred Stock would have been worth at a huge amount at that time even under the distressed Brotman valuations.

88.    Mike's spouse, Kyle Cornish, did not know of any transactions and never consented to any sale or transfer of the Preferred B shares. (She did not learn of these purported

Complaint

Exhibit A

-27-

transactions until May 14th, 2018 at which time she was surprised and strongly objected to the purported sale and withheld her consent.)

89.     Dan further alleges that from time to time following the alleged "initial sale", there were further undocumented sales of Series B Preferred Stock from Mike to Dan totaling an additional 2,222,907 (or 2,645,160 ) shares. Dan admits that these purported further sales were never documented.

90.     Mike alleges that there were no undocumented sales of stock and there were no financial transaction or other indications of any repurchase of stock before May 14th, 2018.

*91.*     No documents or disclosure or appraisal protocol support that there were any sales or any transfer of either the 2,645,160 shares of Series B Preferred Stock or 5,298,800 shares of Series B Preferred Stock.

*92.*     The Company's own Bylaws, various Stock Holder Agreements, and Delaware Corporate Law would not have allowed the sales of stock without satisfying significant procedural hurdles such as have been followed for the JMI merger (i.e. Cosential's 300 page Confidential Disclosure Document dated June 4th, 2018 filed under seal). The standard was set by the JMI/Cosential own merger documents when sensitive and powerful Series B Preferred shares are exchanged, sold, bought or voted. None of these legally required protocols were ever used with Mike's shares until Mike sold shares as part of the merger with Continental Stock Transfer and Trust Company's paying agent Letter of Transmital along with Stock assignment documents, affidavit loss of Stock Certs, etc.

93.     As further evidence that the putative prior sales did not occur, Cosential and/or Dan was in possession of Stock Certificate #10 for 7,943,960 Series B Preferred shares in May 2018 as evidenced by Cosential's own document sent to Mike on May 14th, 2018. This was the Series B Preferred shares certificate registered to Mike and Kyle at the company's formation. There was no mention that Certificate #10 was ever sold or transferred.

94.     In or about 2015, Mike was still in bad financial straits. Cosential hired Mike as an employee performing business development for $10,000 a month. Cosential filed a W-2 showing that Cosential paid Mike $120,000 annually as salary. Cosential reported Mike as living

- 18 -

Complaint

Exhibit A

-28-

in Florida, even though he did not live there. Cosential and Dan also reported Mike as living at Dan's house in Austen, TX even though he never lived there. Mike performed work for Cosential and began to contact leads on new business from a large spreadsheet of contacts that was provided to Mike by Dan. Mike was given a Cosential email address and made many contacts and passed them on to Dan after the negotiations became serious.

95.     At this time, Mike was still a significant shareholder of Cosential common stock and Series B Preferred Stock. Mike had not sold any of his Cosential stock. The negotiations for the Brotman shares had never been realized.

96.     Neither Cosential nor Dan provided Mike with any information about the financial condition of Cosential other than his verbal suggestions that the business client list was growing.

97.     In July of 2016, Mike moved to California. As an employee of Cosential in California, Mike had no information and understanding of how the company was succeeding financially, as its corporate home was in Austin, Texas. Mike only heard Dan's recurring complaint that he and Cosential were financially struggling and at times had to take out one or more loans, even to make payroll. Throughout this and earlier this time, Dan was a corporate insider, likely a majority shareholder, and was CEO of Cosential, and intentionally misrepresented to Mike the financial condition and prospects of Cosential.

98.     In or about July 15 2016, Mike resided permanently in California. Cosential continued to employ Mike to do business development for Cosential when Mike was a resident of California. Cosential paid Mike about $10,000 a month and reported his wages on a W2. Cosential continued to report Mike as a resident of Florida and Texas, even though Cosential was aware that Mike was a resident of California. Mike paid California State income taxes. Cosential finally recognized Mike as living in California when they sent him the proper 2018 W-2 in April of 2019, right before tax day.

Complaint

Exhibit A

-29-

99.     In 2017, according to the Merger Disclosure Agreement and possibly before, Dan began to receive inquiries regarding potential investment and/or potential acquisition transactions involving Cosential. Dan did not tell Mike about it (until much later.[3])

100.    Likely in response to Dan's knowledge that he was potentially very wealthy because of his investment in Cosential stock and Dan's plans to acquire Mike's stock at little to no value, in or about July of 2017, Dan financed an expensive wedding for his only daughter in Vail, Colorado and invited Dan and Mike's parents and cousins but did not invited Mike, his wife or any of his seven children.

101.    In or about October 2017, Mike and Dan's father died, leaving their mother a widow and also further lessening the family bonds.

102.    On October 27, 2017, Mike met up with his brother Dan at their father's funeral in Washington DC. Mike told Dan that Mike was struggling financially and that Mike's only income was the salary that Cosential was paying Mike for business development.

103.    Dan did not tell Mike about JMI's prospective investment in Cosential, even though Mike still owned a substantial number of Cosential shares.

104.    In late 2017, Dan Cornish and Cosential entered into extensive negotiations with JMI Equity to pursue a strategic transaction. Dan did not tell Mike.

105.    In late 2017 or early 2018, Dan received a private offer of a $32 million investment for 50% ownership in Cosential, with Dan controlling and owning the other 50% of Cosential. It valued Cosential at over $60 million.

106.    In February 2018, Cosential entered into a non-binding Summary of Terms (the "Summary of Terms") with JMI Equity pursuant to which JMI Equity would invest in Cosential by purchasing a new class of Series A Preferred Stock and Cosential would use a substantial portion of the investment proceeds to redeem shares from its stockholders, many of whom had held their shares for over 15 years. Dan did not tell Mike.

---

[3] Mike only learned of these earlier contacts in February of 2019 when Cosential Disclosure Document was provided by Dan's attorney.

Complaint

Exhibit A

107.    As a result of the proposed investment, (i) JMI Equity agreed to form a Purchaser entity and purchase shares of Series A Preferred Stock for approximately $33,746,928, (ii) Mr. [Dan] Cornish will contribute to Purchaser shares of Cosential with a value of approximately $27,753,082, and then (iii) all of the shares held by the remaining stockholders in Cosential (including the remaining shares not contributed to Purchaser by Mr. [Daniel] Cornish) will be converted into the right to receive the merger proceeds.

108.    Dan did not disclose this to Mike, even though a merger or reorganization would require Mike to consent as Mike still owned 7,943,960 Series B Preferred shares or about 22.7%. Dan owned approximately 49.5 %. (Dan did not own over 2/3 of the Preferred shares as required to force the merger through without further consent of other shareholders.) Dan's stake would have been further diluted if he had properly accounted for the Brotman shares that Mike had paid for.

109.    In late 2017 or early 2018, Dan and/or Cosential reached an agreement in principal with JMI such that Dan knew that each Preferred Share of Cosential had a value of about $1.12 -1.18.

110.    Instead of informing his brother Mike about the investment and stock offer, Dan sought to defraud his brother Mike and his wife Kyle and his family out of Mike and Kyle's Series B Preferred Stock in Cosential. Dan sought to gain Mike and Kyle's now valuable Cosential shares for himself to sell to JMI, the proposed new investor, for Dan's private profit and for the voting power of the stock.

111.    As part of the scheme planned with the tacit approval possibly of JMI, , Dan planned to sell 7.6 million Preferred B shares to generate cash for himself and roll over 23 million shares tax free into the new entity to maintain a 50% controlling ownership interest in the new Cosential entity that would include a super voting share . Dan planned to cash out 7.6 million Preferred B shares, just slightly more than the 7.521, 707 million Series B Preferred shares that Dan was to scare and defraud Mike out of as part of the scheme.

112.    Dan's plan was to say that these approx. 7.5 million Series B Preferred shares were previously sold, even though he knew and admitted that there were no adequate

- 21 -

Exhibit A
-3|-

consideration paid to Mike and Kyle, and no documentation of any prior sales and no protocol followed to be properly assigned those shares. The scheme included fake volumes and dates for these share transactions. Never was a price mentioned because there never was a price.

113.    In early May of 2018, Dan called Mike in an intimidating and bullying manner and said to Mike that Cosential was in financial trouble, yet again. Dan said and implied to Mike that Cosential stock was worthless or would soon be worthless and out of business unless Cosential received an investment.

114.    At this time, Dan knew that the investment banker JMI had already signed a deal in principal and JMI thought that Cosential was succeeding sufficiently to finance an approximately $33,746,928 dollar investment.

115.    Dan also likely sought furtively to get Mike and Kyle's Series B Preferred Stock so that Dan would have more than 2/3 of the outstanding amount of Series B Preferred shares and did not need to get approval or consent for the merger, "liquidation", reorganization, or acquisition.

116.    On information and belief, JMI knew or should have known that Mike owned a significant amount of the Series B Preferred Stock in Cosential that JMI proposed to acquire

117.    As an employee and outsider and minority shareholder who never received financial reports, Mike had no independent way to know that JMI offered to invest or to know how the company was faring financially. As no other source of information was available, Mike had to rely on Dan, as the majority shareholder of Cosential, the CEO, the corporate insider, and his employer and his only brother and only sibling.

118.    On or about May 14th 2018, Dan called Mike and Dan said that Cosential was in trouble financially again, the company would be worthless and bankrupt, and needed outside investment money or it would not survive. Dan sent Mike a Stock Ownership Agreement on May 14th and bullied Mike, threatening him that he would lose his job and his investment unless he signed immediately. Dan said that Mike needed to sign the Stock Ownership Agreement (SOA) and return it that same day to allow Cosential to survive. Dan said that the Stock Ownership Agreement was nonnegotiable and signing it was the only way Cosential could continue to pay

Complaint

Mike's salary. Dan said that the deal "was on a knife's edge" and must be signed as is and immediately sent back The Cosential email said " Please sign and return today if you can" . Mike viewed the email as a direct order from his boss to immediately sign to save the company.

119.    When Dan knowingly and intentionally made the false representation that Cosential was out of money, the company had no value, and was going under, Dan also threatened Mike with the loss of his only income unless Mike signed the Stock Ownership Agreement. At that time, Dan knew that the Cosential salary was Mike's only income to support his wife and six children.

120.    Since Mike did not have any more money to invest to save the company, Mike feared that if he did not agree to the Stock Purchase, he would lose all of this investment and his only job, his only income.

121.    Dan would not allow Mike any time to get an independent valuation or legal advice.

122.    Dan's urgent appeals and misrepresentations to Mike put Mike under great duress.

123.    At that time, Mike believed Dan when Dan said the Cosential shares were worthless or would soon be worthless if he did not sign the "Stock Ownership Agreement" immediately.

124.    Dan made no disclosure to Mike of anything related to the JMI deal other than what was written in the Stock Ownership Agreement.

125.    Dan and Cosential breached the existing Stockholder's Agreement, including the terms that required that Dan and Cosential provide an appraisal and evaluation if the company merged, sought investment, or an insider bought shares.

126.    Mike relied on Dan and believed Dan, as Dan was representing information that Dan as CEO would know, and it was consistent with Cosential previously bad financial difficulties.

127.    Totally reliant on his brother Dan for a job, money and information about his stock value, Mike was overcome by Dan's overwhelming power over him, Dan's insider position

Complaint

Exhibit A

-33-

as employer, and Dan's insistence that Cosential would fail without Mike's immediate signing of the nonnegotiable Stock Ownership Agreement document. The Stock Ownership Agreement was a contract of adhesion drafted by and for Dan and Cosential and perhaps JMI, by their common counsel, and offered as "nonnegotiable" to Mike for immediate signature under the false pretense of the company's failure if Mike did not comply. Mike was the weaker party, relying on and trusting his brother/employer/corporate insider to tell him the truth and deal with him fairly.

128.    More specifically, failing to disclose material terms, Dan misled, defrauded, misinformed, intimidated, bullied and fraudulently induced his brother and employee Mike Cornish with undue influence to sign a "Stock Ownership Agreement" that falsely stated that Mike previously sold 5,298,800 shares of Series B Preferred Stock by purported agreement dated March 8, 2011, and additionally to purportedly recognize multiple undocumented purported subsequent transfers totaling 2,222,907 shares of Series B Preferred Stock, leaving him with 422,253 sales of Series B Preferred Stock and 175,056 of common shares.)

129.    Mike signed the Stock Ownership Agreement under duress and undue influence, defrauded, mistaken about the facts, induced by fraudulent representations, misinformed and suffering from constructive fraud, duress, mistake, breach of fiduciary duties, unconscionability and contrary to fair dealing.

130.    Uninformed and intimidated by Dan, fearful of losing his only employment, income and support, and forced into a sale/gift under duress, Michael signed the "Stock Ownership Agreement" the same day that Dan required him and demanded him to sign it.

131.    Mike's reliance on Dan was reasonable. Mike knew that Cosential had been in financial jeopardy in the past. In years past, Mike had helped Dan by investing more money in Cosential to keep Cosential solvent but Mike could not afford to make any further investment. From hearing Dan's complaints, Mike knew that the company had to take loans to make payroll in the past, and the company reasonably could be worthless, especially if it could not make its payroll and retain its engineers and employees.

132.    Through the fraudulent "Stock Ownership Agreement", Dan obtained the necessary 70.1% of Preferred B shares so he did not need consent of other shareholders in order

to force through the merger with JMI. Such 2/3 consent of the Series B Preferred shareholders need for the Merger could now come under further investigation.

133.    In actual fact, neither sale nor transfer ever happened. There were no oral or written agreements to transfer any shares before May 2018. There was never any price agreed for these sales as any sales contract requires.  The disputed and fraudulently induced SOA admits the purported sales of 2,222,907 shares "was never formally documented".

134.    As additional indications that no sales took place, the Company's own Bylaws, Federal and State Law, various Stock Holder Agreements and Delaware General Corporate Law require significant procedural hurdles that were not observed and which did not occur. To undertake a sale would require formal procedures akin to those followed for the JMI merger. Under Consential's own disclosure document rules, as part of the merger, sales of Cosential stock are restricted and only allowed under "limited circumstances under Federal and State Securities law". Their own document admits that these sales never happened.

135.    As further evidence of no prior putative sales, Stock Certificate #10 for 7,943,960 Series B Preferred shares still existed in May 2018.

136.    Weeks later, in June 2018, Dan and Cosential proposed a second agreement with a newly created Stock Certificate showing Mike and Kyle only owning 422,253. Most other shareholders apparently sold their stock by filling out an "Affidavit of lost Certificates for assignment to Continental Stock Transwfer and Trust" Mike had a new Certificate created for him and him alone in order to perpetuate the scheme.

137.    A second agreement, the stock purchase agreement purported to transfer the rest of Mike's Cosential stock at the valuation of $675,000.

138.    Based on information and belief, the investment banker JMI knew or had reason to suspect that the 7,943,960 shares were legally in Mike's name, and the 5,298,800 and 2,222,907 shares were going to be sold in multiple fake transactions to Dan, Cosential, or JMI at zero or below market value. Based on information and belief, it is believed that after the investment,  the Cosential preferred shares would eventually be increased fivefold to valuing the whole company at as much as $300 million.

Complaint

Exhibit A

139.   Mike's wife, Kyle, did not see the Stock Purchase Agreement and did not agree to it. She did not consent to the transfer of her community property in the Cosential shares. Kyle was furious at Mike once she heard about what happened and told Mike at the time that she would never agree to such a deal.  Dan was aware that she was not informed and did not consent to the deal.

140.   For the next few months from May to October 2018, Cosential continued to pay Mike the $10,000 a month salary minus employment taxes pursuant to the oral agreement between Dan, Cosential and Mike to continue the salary to Mike at least through the end of 2018. Mike remained an employee of Cosential working and residing in California under the terms of an oral agreement between Mike and Dan. At this time, he had no reason to suspect that Dan had wronged him. Mike understood that Cosential had been in financial distress and was barely viable as a business. This was consistent with Dan's representations that Dan had repeatedly told Mike that Cosential was in precarious financial situation and the Dan had to take out loans to pay payroll.

141.   In October 2018, Cosential stopped paying Mike without notice in violation of the oral agreement. In November 2018 Dan wrote Mike that JMI demanded that Dan and Cosential stop paying Mike a salary.

142.   As a result of the breach of the employment agreement and non-payment of wages, Cosential also failed to pay Mike's wages in an amount more than $25,000 for November and December 2018. In addition, in further violations of the employment agreement, Cosential and Dan failed to pay Mike the earned and unused vacation and sick pay at the time that the October 7th pay period fell due.

143.   In early December, Mike and Dan spoke of " the Belle Terre transaction" via email and phone. This transaction was about a sale of Mike's share of the Belle Terre house that Dan apparently wanted full control of even before Dan and Mike's mother died. Dan and Mike's mom was in very good health at the time and continues to be so.  Dan and Mike and their mother had prepared a living will for this property in New York that Dan and Mike grew up in. The house was being rented to a third party and the income was going to Dan and Mike's mother for

Complaint

Exhibit A

living expenses. Dan said in early December that he was going to include a release in the Belle Terre deal in case Mike decided to not assign his share over to Dan after their mother died. Dan's exact words were "I want to make sure you(Mike) don't fuck me (Dan) and not assign over the house" On Saturday, December 29th, without notice, Dan then sent Mike a Release Agreement which was purportedly about the sale of their parents' home in Belle Terre NY where they grew up together, but was in fact primarily consisted of a release about Cosential and the Cosential stock that was admittedly drafted by Cosential legal counsel. Dan was, in effect, seeking to get an additional release about the fraudulent Cosential transaction in the guise of asking Mike to sign a new release in return for $350,000 for the ownership of the half share of their parents' home. Dan claimed he wanted to own the house by himself even though he lived in Texas and had no plans to leave.. This additional brazen attempt to furtively deprive Mike of his rights in the Series B Preferred shares was engineered with the help of Cosential counsel and the possible consent of JMI management.   In the same pattern of dishonesty and trickery that transpired for the May 14th, 2018 purported signing of the SOA, Dan asked Mike to sign it and return it without negotiation on Monday, December 31, New Year's Eve, knowing that finding legal counsel would be next to impossible to retain and opine on the document over the New Year's weekend.

144.    Mike was surprised by content of the second proposed Release Agreement. Seeing that  the proposed Release Agreement was concerned with releasing potential claims by Mike about the Cosential stock instead of about the their parents property in Belle Terre, NY, Mike was greatly surprised, and suddenly found this second release agreement suspicious. The second release agreement triggered Mike's first suspicions that Dan had been untruthful about the Cosential stock sale.

145.    The next day, Dan sent this email:

**Subject: Agreement**

**Date:** December 30, 2018 at 10:45:20 AM PST

Mike,

Do you want to close the BelleTerre deal. I sent you the agreement yesterday. Let me know so

Complaint

Exhibit A

-37-

we can get it done Monday.

Dan

146.    After Mike's suspicions were first triggered by the second proposed 8 page Release Agreement, Mike did not sign and instead sought counsel.

This new release crafted by Cosential Corporate Counsel asked Mike to agree that Mike never owned 7.9m Series B Preferred Stock even though he did and their own document admitted to as much in the first Whereas clause of the May 14th, 2018 where it stated "including Stock Cert #10 for 7,943,960 shares of the Company's Series B Preferred Stock". The release even asked Mike to ignore the previous undocumented sales equaling $7,521,707 shares of Series B Preferred Stock as if they never happened.  The actual Real Estate transaction was an Exhibit. The Release asked Mike to agree to release Dan and Cosential  and JMI et al.  from any and all rights, claims, counterclaims, demands, suits, actions, causes of action, including but not limited to claims for negligence, gross negligence, fraud, statutory fraud, securities fraud, Texas Securities Act violations, failure to disclose, misrepresentation, fiduciary duty, breach of contract, and any other suits. These claims are exactly what  they did and clearly they wanted a full release from these illegal actions.

147.    After the inquiry, Counsel researched and discovered that Cosential had received a capital influx of $34 million dollars from JMI at about the time that Dan caused Mike to sell his shares at a steep discount based on the false representations. Counsel informed Mike that in fact Cosential was likely not in financial jeopardy before the sale and the basis of the reason what Dan said was likely not true. When Dan found out that Mike was seeking counsel for the second release, he called Mike in a panic three times on a Sunday and offered to pay Mike's legal expenses and saying that he could rip up the release if " you don't like it and want to

Complaint

change it". Dan asked Mike a direct question as he began the second phone call: "Are you going to sue me?"

148.    Mike reacted with shock, surprise and indignation to the news that Cosential stock had been extremely valuable and received a large influx of money.

149.    According to information available to counsel, JMI invested $34 million in Cosential to receive something equal to or less than 50% of the shares, ownership or control of the Cosential. Dan Cornish retains the other 50% or greater share of Cosential. There are no other owners.

150.    Kyle asserts that she was unaware of the transfer of the Cosential stock, did not consent to transferring her community property interest, and that any transfer of either the 2,222,907 (2,645,160) shares of Series B Preferred Stock or 5,298,800 shares of Series B Preferred Stock in Cosential, Inc. was illegal under California law.

151.    Kyle Cornish asserts that the transfer of the (7,521,707) out of the total of 7,943,960 of Series B Preferred Stock in Cosential, Inc. was an impermissible gift and a conveyance "for less than fair and reasonable value" and inappropriate under Section 1100 of the California Family Code Law.

152.    Mike alleges that Dan intended to deceive Mike, Dan knew his representations were false, Dan misrepresented material facts to Mike with the knowledge of their falsity, Mike reasonably relied on Dan, and Mike suffered the loss of more than $8.649 million because of Dan's misconduct and wrongdoing. Specifically, Dan wrongly perpetuated a fraud on Mike by failing to inform him of the correct value of his shares at the time of compelling Mike to sign the Stock Ownership Agreement and thereafter, telling him that the company was about to fail, requiring urgency, fabricating past stock sale agreements, to make it appear that Mike previously sold shares to Dan.

153.    Mike also alleges that Dan failed to account for the Brotman shares that Mike invested in and is still holding those shares in a constructive trust Mike also alleges that Cosential owes Mike $110,000 for the loss the security deposit for the lease at 15, Old Danbury Rd in Wilton Ct.

Complaint

Exhibit A

154.    The cause of action accrued on or after December 30, 2018 when Dan put Mike on notice by sending Mike the release agreement that first raised Mike's suspicions. At the earliest Mike could have discovered the fraud or facts that would lead a reasonable prudent person to suspect fraud was on that date in that Dan sent the proposed Release on December 29, 2018.

## KYLE CORNISH EXERCISES RIGHT TO VOID IMPROPER GIFT OF COMMUNITY PROPERTY

155.    Mike assets all of the claims and seeks all relief available to him including rescission, restitution, and/or in the alternative damages of $60 million, which would be the fair market value of the stock wrongly transferred. Mike seeks rescission of the "Stock Ownership Agreement", any prior putative "sales", restitution, and/or in the alternative damages of $60 million, which would be the fair market value of the stock wrongly transferred (after JMI's investment). Mike also seeks the salary amounts owed in Dan's and Cosential and JMI's violation of the employment agreement, and all other relief and recovery sought in this Complaint.

156.    Although Mike did not know it at the time, at best the Stock Ownership Agreement effected an unlawful gift under California law of community property shares in Cosential. Prohibition against unilateral gifts of community personal property and community real property is absolute. Any gift of community property, regardless of the nature of the donee or the size of the gift, may be voided and recaptured for the community by a non-consenting spouse *Family Code* Section 1100.

157.    Mike and spouse, Kyle Cornish, also independently seeks rescission and restitution of the putative transfer or "sales" of Cosential shares that were community property and purportedly transferred under the disputed SOA as a gift or below reasonable value, and all other relief and recovery sought in this Complaint. Kyle Cornish is the non-consenting spouse with a right to void the gift. Kyle gives notice that she chooses to void the transfer in the SOA in whole under California *Family Code* Section 1100. Kyle his wife, also asserts all claims and seeks all of the relief available to her, including rescission and restitution of the Cosential shares that were community property and transferred as a gift or below reasonable value.

- 30 -

## VIOLATIONS ALLEGED

## FIRST CAUSE OF ACTION

### Fraud

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

158.　Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1- 157.

159.　Dan Cornish intentionally and knowingly misrepresented, concealed, and failed to disclose material facts, with knowledge of the falsity or concealing, with the intent to defraud or induce reliance, which Mike justifiably relied on, causing damages to Mike.

160.　Cosential directly and indirectly through Dan Cornish and his agents, intentionally and knowingly misrepresented , concealed, and failed to disclose material facts, with knowledge of the falsity or concealing, with the intent to defraud or induce reliance, which Mike justifiably relied on, causing damages to Mike

161.　JMI directly and indirectly through Dan Cornish, Cosential and his agents, intentionally and knowingly misrepresented , concealed, and failed to disclose material facts, with knowledge of the falsity or concealing, with the intent to defraud or induce reliance, which Mike justifiably relied on, causing damages to Mike.

162.　A single false representation as to a material fact made with the intent to defraud and relied upon by another party supports an action for fraud. (*Sears v. Myerson* (1930) 106 Cal. App. 220, 222-23.) In addition, deceit may be negative as well as affirmative, arising out of the suppression of information that should have been revealed, as well as by the expression of information that is false. (*Agnew v. Cronin* (1957) 148 Cal. App. 2d 117, 129-130.)

163.　The defendants each made representations with a knowledge of its falsity or a knowledge of the effect of concealment of a material fact. (*Cicone v. URS Corp.* (1986) 183 Cal. App. 3d 194, 227.) Each defendant's intended to enduce Mike action in response to the misrepresentation. (*Ashburn v. Miller* (1958) 161 Cal. App. 2d 71, 79.)

164.　Mike actually and justifiably and reasonably relied on the defendant's misrepresentations. (*Conrad v. Bank of America* (1996) 45 Cal. App. 4th 133, 157.) Reliance on

1  the misrepresentation caused the plaintiff damage. (*Nagy v. Nagy* (1989) 210 Ca. App. 3d 1262,

2  1268.)

3  ### SECOND CAUSE OF ACTION

4  #### Constructive Fraud

5  *(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

6      165.   Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1- 157.

7      166.   Dan Cornish in a breach of his various duties to Mike, including as a corporate

8  director, majority shareholder in Cosential, and as his employer, whether with or without an

9  actual fraudulent intent, gained an advantage to himself from Mike and Kyle, by Dan misleading

10  Mike and Kyle to his/their prejudice. Civ.Code § 1573

11      167.   Cosential via its officers and directors, including but not limited to Dan Cornish in

12  a breach of his various duties to Cosential and to Mike, including those duties in the

13  Stockholders Agreement, as a corporate director , and as his employer, whether with or without

14  an actual fraudulent intent, gained an advantage to the corporation or to the corporations' insiders

15  or officers from Mike and Kyle, by Cosential through its officers or directors or agents,

16  misleading Mike and Kyle to his/their prejudice

17      168.   JMI via its officers and directors, including but not limited to JMI directors

18  working in concert with Dan Cornish in a breach of his various duties to Cosential and to Mike,

19  including those duties in the Stockholders Agreement, as a corporate director , and as his

20  employer, whether with or without an actual fraudulent intent, gained an advantage to JMI,

21  Cosential, the corporation or to the corporations' insiders or officers from Mike and Kyle, by JMI

22  or Cosential through its officers or directors or agents, misleading Mike and Kyle to his/their

23  prejudice

26  ### THIRD CAUSE OF ACTION

27  #### Breach of Fiduciary Duties

28  *(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

- 32 -

Complaint

169.    Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1- 157.

170.    Dan Cornish had various fiduciary duties, as majority shareholders, as officers, directors, and insiders and otherwise, to Mike and Kyle including as stockholders, which Dan breached by failing to disclose material information, acting adversely to the interests of Mike and Kyle, self-dealing, and otherwise procuring the shares for himself at less than fair market value, and in breach of the fiduciary duty, proximately caused damages to Mike and Kyle as specified above.

171.    Cosential and its officers and directors had various fiduciary duties once it entered in to a deal with JMI, as insiders and otherwise, to Mike and Kyle including as stockholders, which Cosential breached by failing to disclose material information, denied Mike and Kyle valuable voting power,  acting adversely to the interests of Mike and Kyle, self-dealing, and otherwise procuring the shares for Cosential, Dan or JMI at less than fair market value, and in breach of the fiduciary duty proximately caused damages to Mike and Kyle as specified above.

172.    JMI had various fiduciary duties once JMI enters into a deal in principal, as insiders and otherwise, to Mike and Kyle including as stockholders, which JMI breached by failing to disclose material information, acting adversely to the interests of Mike and Kyle, self-dealing, and otherwise procuring the shares for Dan or JMI at less than fair market value, and t breach of the fiduciary duty proximately caused damages to Mike and Kyle as specified above.

173.    Defendants each owed the highest duty of good faith to the corporation and its stockholders, and were required act for the interest of the corporation and its stockholders with due care and diligence and within the bounds of their authority. (*Professional Hockey Corp. v. World Hockey Ass'n* (1983) 143 Cal. App. 3d 410, 414-15; *Mueller v. MacBan* (1976) 62 Cal. App. 3d 258, 274.) As one of their fiduciary duties, directors and officers owe the duty of loyalty, which require that directors and officers not act in their own self-interest when the interest of the corporation or its stockholders will be damaged thereby. Directors and officers cannot secure any personal advantage as against the corporation or its stockholders. (*Professional Hockey Corp. v. World Hockey Ass'n* (1983) 143 Cal. App. 3d 410, 414-

Complaint

Exhibit A

-43-

15;*Bancroft-Whitney Co. v. Glen* (1996) 64 Cal. 2d 327, 345; *Bainbridge v. Stoner* (1940) 16 Cal. 2d 423, 427.)

174.   Where a director or officer has knowledge of special facts affecting the value of its stock, he cannot deal with a stockholder at arm's length but is under a fiduciary duty to disclose such facts before making a purchase or sale of the stock. (*Hobart v. Hobart Estate Co.* (1945) 26 Cal. 2d 412, 433;*Haussler v. Wilson* (1958) 164 Cal. App. 2d 421, 427.) A director or officer, in buying stock from a stockholder, must inform the stockholder of those matters relating to the corporate business of which the director or officer has knowledge and which the stockholder has a right to know about, so that the stockholder may have the benefits of such information in judging the advantages of the deal. Without such disclosure, the fiduciary duty of the director or officer has not been discharged and thereby breached.

175.   Defendants breached their fiduciary duties. As a direct and proximate result of the breach of fiduciary duty, Mike Cornish and Kyle Cornish transferred their Series B Preferred shares as described above for nothing or substantially below market value.

176.   The breach of fiduciary duty by the defendants was willful, malicious and/or fraudulent because Dan Cornish and the other defendants engaged in such acts in order to obtain personal profit at the expense of Mike Cornish and Kyle Cornish so as to justify an award of exemplary and punitive damages in an amount subject to proof at time of trial

## FOURTH CAUSE OF ACTION

### Fraudulent Misrepresentation

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

1.   Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1- 157.

2.   Dan Cornish represented to Mike an important fact about the dire state of Cosential financing was true; (2) that Dan's representation about the financial state of Cosential was false; (3) Dan knew that the representation was false when Dan made it, or Dan made the representation recklessly and without regard for its truth; (4) Dan intended that Mike rely on the representation as the basis for Mike to sign the Stock Ownership Agreement; (5) Mike

- 34 -

Exhibit A

-44-

reasonably relied on the representation; (6) Mike was harmed by the great reduction in the money received for the stock; and (7) Mike's reliance on Dan's representation was a substantial factor in causing that harm to Mike.

3.     Cosential represented to Mike an important fact about the dire state of Cosential financing was true; (2) that representation about the financial state of Cosential was false; (3) Cosential through Dan knew that the representation was false when Dan made it, or Cosential through Dan made the representation recklessly and without regard for its truth; (4) Cosential and Dan intended that Mike rely on the representation as the basis for Mike to sign the Stock Ownership Agreement; (5) Mike reasonably relied on the representation; (6) Mike was harmed by the great reduction in the money received for the stock; and (7) Mike's reliance on Cosential and Dan's representation was a substantial factor in causing that harm to Mike.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

4.     Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1- 157.

5.     Dan misrepresented a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce Mike's reliance on the fact misrepresented; (2) Mike' was ignorant of the truth and he justifiably relied on the misrepresentation by Dan to him; and (3) Dan's misrepresentation resulted in damage to Mike.

6.     Cosential misrepresented a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce Mike's reliance on the fact misrepresented; (2) Mike was ignorant of the truth and justifiably relied on the misrepresentation by Cosential to him; and (3) Cosential's misrepresentation resulted in damage to Mike.

7.     JMI misrepresented a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce Mike's reliance on the fact misrepresented; (2)

Complaint

Exhibit A
-45-

Mike was ignorant of the truth and justifiably relied on the misrepresentation by JMI to him; and (3) JMI's misrepresentation resulted in damage to Mike.

## SIXTH CAUSE OF ACTION

### Breach of Written Agreements- Agreement

*(Against Daniel Cornish, Cosential, Cosential Entities, Does)*

8.     Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1- 157.

9.     Cosential entered in a Stockholder Agreement at or before the time of Mike and Kyles' initial investment, Mike and Kyles performed everything that they needed to do to satisfy their performance. Mike is currently making efforts to obtain a copy of the Stockholders Agreement.

10.    The various written Agreements with Cosential and Dan Cornish provided for appraisal rights, dividend rights, voting rights, ROFR rights and other rights that protected Mike and Kyle. The Agreement also limited Cosential and its insider's actions.

11.    Cosential and Dan Cornish breached the various written agreement when it failed to offer appraisal rights and other rights before a sale, merger, or reorganization. Mike was harmed by Dan and Cosential's breach of the Agreement by failing to receive information and an appraisal as well as proper value for his stock. Kyle Cornish was also harmed by Dana and Cosential breach of the Agreement.

12.    At the time of JMI's letter of investment, Dan Cornish and Cosential failed to do something that the contract required by failing to give an appraisal and evaluation as well as provide accurate information about the investment. Also Dan and Cosential did something that the contract prohibited by arranging an investment that failed to provide Mike and Kyles with fair market value for their stock which harmed Mike and Kyle. Dan's and Cosential's breach of contract was a substantial factor in causing Mike and Kyles harm.

13.    Some of the specific actions of JMI/ Cosential that were illegal and rights of Mike's Preferred B stock that were ignored/ violated based upon limited information

Complaint

Exhibit A
-46-

inlcude:

1. Authorization of the Merger including Any 2/3 vote of Preferred B shareholders happened without my written consent due to the fraudulent conversion of my stock.

2. Adoption and approval of Certificate of Amendment of Certificate of Désignation happened without my written approval due to the fraudulent conversion of Stock.

3. Section 228 (e) of Delaware General Corporate Law was violated and denied to me due to the fraudulent conversion of Stock.

4. Termination of Rights Agreement was done without my written approval due to the fraudulent conversion of my Stock.

5. The waiver all rights of first refusal, co-sale rights, notice rights or other similar rights under the Stockholders' Agreement with respect to the offer, sale or transfer of shares by Cornish in connection with the Rollover Transaction; and
• the termination of the Rights Agreements, effective as of the Closing of the Merger last June have all been done without my written approval due to the fraudulent conversion of Stock.

6. All Appraisal rights, both contractually from the Rights Agreement, Certificate of Incorporation, Certificate of Designation, and StockHolder Agreement of 2002, and Statutory Appraisal rights from Section 262 of the DGCL we're illegally ignored and denied to me due to the fraudulent conversion of my Stock.

7. All disclosures and notifications of the JMI Cosential merger were denied to me due to the fraudulent conversion of my Stock.

Complaint

Exhibit A

-47-

8. All monies paid to Dan last June for approximately 7.5m Preferred B stock were illegal due to the fraudulent conversion of Stock.

9. US Federal Tax Conséquences of the Merger were not disclosed due to the fraudulent conversion of Stock.

10. Risk factors of the unapproved Merger were not disclosed to me due to the fraudulent conversion of my Stock.

11. Representations and Warranties of the Merger were false due to the fraudulent conversion of my Stock.

12. Interests of Certain Parties of the Merger including those of Dan Cornish and Indemnification Obligations effectuated and put into effect due to the Merger were falsely stated and represented and possibly null and void due to the fraudulent conversion of my Stock.

13. All accrued dividends of approximately 7.5m Preferred B shares were illegally denied to me due to the fraudulent conversion of my Stock.

Under Section 262(d)(2), where a merger is accomplished pursuant to Section 228 of the Delaware General Corporation Law, either a constituent corporation before the effective date of the merger, or the surviving or resulting corporation within 10 days after the effective date of the merger, must notify each stockholder of each constituent corporation entitled to appraisal rights of the approval of the merger and that appraisal rights are

Complaint

Exhibit A

-48-

available to such stockholders and include in each such notice a copy of Section 262.Pursuant to Section 228(e) of the DGCL, the holders of Series B Preferred Stock are hereby notified of the adoption and approval of the Certificate of Amendment to the Certificate of Designation of the Series B Preferred Stock pursuant to resolutions attached hereto as Appendix D (including the Certificate of Amendment) by written consent of the holders of at least two-thirds of the outstanding voting power of the shares of Cosential Series B Preferred Stock entitled to vote thereon.

Section 4.02 Authorization.

(a) The Company has all requisite power and authority to execute and deliver this Agreement, the Certificate of Merger and each of the other Related Agreements to which it is or will be a party and, subject to the Company Stockholder Approval to consummate the transactions contemplated hereby and thereby. At a meeting duly called and held, or by written consent, the Company Board has unanimously (i) determined that the Merger is advisable, fair to, and in the best interests of, the Company and the stockholders of the Company, (ii) adopted and approved this Agreement, the Related Agreements to which it is or will be a party, the Merger and the other transactions contemplated by this Agreement and the Related Agreements to which the Company is or will be a party, and (iii) recommended that the stockholders of the Company adopt and approve this Agreement, the Merger and the other transactions contemplated by this Agreement and the Related Agreements to which it is or will be a party (collectively, the "Company Board Approval"), and no other corporate actions on the part of the Company Board are necessary in connection with the authorization, execution and delivery of this Agreement and the Related Agreements to which the Company is a party by the Company and the performance by the Company of the Merger and the other transactions contemplated hereby and thereby. The Company has delivered to Purchaser a copy of the Company Board Approval which has not been, and at the Closing will not have been, revoked, rescinded or amended.

(b) The adoption and approval of this Agreement and the approval of the Related

Agreements to which the Company is or will be a party and the transactions contemplated hereby and thereby, including the Merger, by the Requisite Stockholders pursuant to the Written Consent (the "Company Stockholder Approval") when adopted and approved by the Requisite Stockholders shall constitute all of the votes, consents and approvals required of the stockholders of the Company for the authorization, execution and delivery by the Company of this Agreement and the Related Agreements to which the Company is or will be a party and the performance by the Company of transactions contemplated hereby and thereby, including the Merger. The execution and delivery of the Written Consent, when adopted and approved by the Requisite Stockholders, will constitute the valid and effective Company Stockholder Approval. At the Closing, the Written Consent will not have been revoked, rescinded or amended. The Total Merger Consideration to be distributed among the Stockholders will be in accordance and full compliance with the Company Certificate of Incorporation, the Allocation Certificate and any other contract or agreement to which the Company is a party or is otherwise bound.

14.     **Mike and Kyle are Third Party Beneficiary of JMI's investment in Cosential**

Mike was not a party to the contract between JMI and Cosential. However, Mike is entitled to damages and the fair market value of his stock because he was intended to be a beneficiary of the JMI investment.

### SEVENTH CAUSE OF ACTION
### Intentional Interference With Prospective Economic Relations

*(Against Daniel Cornish, Cosential, Cosential Entities, Does)*

15.     Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1- 152.

16.     Dan Cornish intentionally interfered with an economic relationship between Mike Cornish and JMI that would have resulted in an economic benefit to Mike Cornish. Mike owned the Cosential shares that JMI was interested in acquiring. Mike owned voting power that JMI needed, Mike and JMI were in an economic relationship that probably would have resulted in an economic benefit to Mike with JMI's investment but for Dan's interference. Dan knew of the relationship between Mike and JMI. Dan engaged in the tactic to gain the Preferred shares in

- 40 -

Complaint

Cosential for himself and by engaging in this conduct, Dan intended to disrupt the relationship or knew that disruption of the relationship between JMI and Mike was certain or substantially certain to occur. The relationship between JMI and Mike was disrupted causing Mike harm. Dan's conduct was a substantial factor in causing Mike's harm

## EIGHTH CAUSE OF ACTION
## Intentional Interference With Prospective Economic Relations

*(Against JMI, Does)*

17.     Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1- 157.

18.     Mike Cornish claims that JMI intentionally interfered with an economic relationship between Mike and Cosential that probably would have resulted in an economic benefit to Mike and Kyle Cornish. Mike and Cosential were in an economic relationship that probably would have resulted in an economic benefit to Mike by his continuing to own the shares. JMI knew or should have known that Mike was a shareholder. JMI engaged in investment and buying of the shares directly or indirectly to gain control or an ownership stake in Cosential or the entities and depriving Mike of an ownership interest in Cosential or the Cosential entities. By engaging in this conduct, JMI intended to disrupt the relationship between Mike and Cosential and or knew that disruption of the relationship was certain or substantially certain to occur. Mike's relationship with Cosential was disrupted and Mike was harmed. JMI's conduct was a substantial factor in causing Mike's harm.

## NINTH CAUSE OF ACTION

## Wrongful Termination

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

19.     Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1-157.

20.     Dan Cornish, Cosential, and JMI wrongly terminated and wrongfully discharged Mike Cornish from employment for reasons that violate California public policy. It is a violation of public policy to terminate an employee for fear that the employee will learn of the past fraudulent behavior of the company by virtue of his continuing employment, which was the

- 41 -

Exhibit A
-51-

substantial motivating cause of Cosential, Dan and JMI to terminate Mike's employment, thus harming Mike.

## TENTH CAUSE OF ACTION

### Breach of Oral Employment Contract

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

21.     Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1-157.

22.     Mike Cornish and Cosential entered into an oral contract for employment at $10,000 a month through at least the end of 2018. Mike did all, or substantially all, of the significant things that the contract required. Cosential terminated the contract two month early and failed to pay the last two months' salary. Mike was harmed by the breach of the oral contract. Cosential's breach of contract was a substantial factor in causing Mike's harm.

23.     Mike Cornish and Dan Cornish entered into a contract for employment at $10,000 a month through at least the end of 2018. Mike did all, or substantially all, of the significant things that the contract required. Dan Cornish terminated the contract two month early and failed to pay the last two months slurry. Mike was harmed by the breach of the oral contract. Dan Cornish's breach of contract was a substantial factor in causing Mike's harm.

## ELEVENTH CAUSE OF ACTION

### Unfair Competition

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

24.     Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1-157.

25.     Mike shows that Dan Cornish, JMI and/or Cosential perpetrated an 'unlawful, unfair, or fraudulent business act or practice,' and engaged in 'unfair, deceptive, untrue or misleading advertising' when Dan Cornish, JMI and/or Cosential sought to gain Mikes shares under the Stock Ownership Agreement in violation of Business and Profession Code Section 17200.

26.     Mike and Kyle established that they lost and were deprived of the market value of their Preferred stock shares and that the economic injury was the result of and caused by, the

- 42 -

Exhibit A
-52-

unfair business practice or false advertising of Dan Cornish, Cosential and JMI in the merger, reorganization or investment that is the gravamen of the claim."

## TWELFTH CAUSE OF ACTION

### Violation of Labor Code Sections 201, 203, 206.5, 218.5, 218.6, 2082, 2084.

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

27.    Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1-157.

28.    <u>Labor Code Section 201.</u> Cosential failed to pay Mike the two months' salary and fringe benefits owed on the oral contract at the time of termination. Under Labor Code Section 201, if an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately. Cosential, Dan and JMI owed Mike's wages owed of more than $25,000 at the time of discharge. Mike was not paid any earned and unused vacation or sick pay at the time of discharge. The discharge was done with no notification when Mike's October 7th pay period never showed up in his bank account that was set up with auto-pay.

29.    <u>Labor Code Section 203.</u> Dan, Cosential and JMI willfully failed to pay Mike, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 201.9, 202, and 205.5, so Mike's wages shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced.

30.    <u>Labor Code Section 206.5.</u> In May 2018, Dan, Cosential and JMI wrongfully required the signature on the Stock Ownership Agreement (SOA) as a condition for continuing his salary and employment which was the subject of a prior existing oral agreement. Dan, Cosential and JMI violated Labor Code Section 206.5 which holds that an employer shall not require the execution of a release of a claim or right on account of wages due, or to become due, or made as an advance on wages to be earned, unless payment of those wages has been made. A release required or executed in violation of the provisions of this section shall be null and void as between the employer and the employee. As separate and additional reasons

- 43 -

Exhibit A

-53-

why the Stock Ownership Agreement in 2018 was unlawful and null and void, Mike asserts Section 206.5 as an independent ground for invalidating the SOA.

31.   <u>Attorney Fees Labor Code Section 218.5.</u> Mike seeks attorney fees as this is in part an action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, and the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action.

32.   <u>Interest Labor Code Section 218.6.</u> Mike seeks interest on all monies due and payable including under Section 218.6. Since this is in part an action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code, which shall accrue from the date that the wages were due and payable as provided in Part 1 (commencing with Section 200) of Division 2.

33.   <u>Labor Code 2802.</u> Mike seeks indemnity from all claims against him or Kyle. Dan, Cosential and JMI are employers of Mike. An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful. "California law requires that employers indemnify their employees for lawsuits brought against the employee for acts committed in the course and scope of the employee's employment.

34.   Mike was obedient to Dan, Cosential and JMI, individually, jointly and severally, who were unscrupulous employer (s). Mike was obedient to Dan, his boss and the CEO of Cosential when under duress Mike acted to sign away stock in order to save the company, signing the fraudulent SOA as demanded on the same day requested by Dan in an official company email, the CEO and President. Mike was obedient to Dan, Cosential and JMI to save the company when he was compelled under duress and undue influence and mistake to sign the fraudulent SOA that contained as part of the fraud jurisdiction and choice of law clauses that

Complaint

Exhibit A
-54-

waived the employee's rights to California Laws in order to save the company. As an employee, Mike acted as an employee to sign the SOA because Dan said the Stock was otherwise worthless and to save the company including to save his salary, he signed the SOA. Dan, Cosential and JMI, individually, jointly and severally, violate Labor Code § 2802(a).

35.   <u>Labor Code Section 2804.</u> Dan, Cosential and JMI, individually, jointly and severally, violated Labor Code Section 2804 when each directly or indirectly compelled Mike to sign the SOA that contained waiver of California law and Labor Code protections. Dan's lies, misrepresentations, threats and coercion to compel Mike to sign the SOA that contained fraudulently obtained clauses about jurisdiction and choice of law were an integral part of the fraud to take Mike's valuable stock. The agreement to waive the benefits of California law that Dan, JMI and Cosential obtained from Mike under duress and under the threat of unlawful firing and reneging on the agreement to pay his salary that would allow Mike to support his wife and children means that the SOA is null and void. The fraudulently obtained SOA would be included within " Any contract or agreement, express or implied, made by any employee to waive the benefits of this article or any part thereof, is null and void, and this article shall not deprive any employee or his personal representative of any right or remedy to which he is entitled under the laws of this State." Cal. Labor Code § 2804. Labor Code section 2804 voids any agreement to waive the protections of Labor Code section 2802 as against public policy. Mike also seeks all reasonable costs, including, but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section.

### THIRTEENTH CAUSE OF ACTION
### <u>Violation of Family Code Section 1100</u>

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

36.   Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1-157

37.   Although Mike did not know it at the time, at best the Stock Ownership Agreement effected an unlawful gift of community property shares in Cosential. Prohibition against unilateral gifts of community personal property and community real property is absolute.

- 45 -

Exhibit A

-55-

Any gift of community property, regardless of the nature of the donee or the size of the gift, may be voided and recaptured for the community by a non-consenting spouse. Kyle Cornish as the non-consenting spouse with a right to void the gift. Kyle gives notice that she chooses to void the transfer or the Cosential stock in whole under California *Family Code* Section 1100.

## FOURTEENTH CAUSE OF ACTION
### Violations of California Corporations Code Sections

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

**38.**    Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1-152.

39.    At all times mentioned in this complaint, Dan Cornish was Chief Executive Officer, Treasurer President, Director officer or otherwise in a relationship with Cosential which allowed Dan Cornish access to inside information. As a result of that relationship, Dan Cornish had access to material information about Cosential which would significantly affect the market price of its securities, was not generally available to the public, and which Dan Cornish knew was not intended to be available to the public.

40.    At specific times mentioned in this complaint, JMI and its employees and agents were corporate insiders or otherwise in a relationship with Cosential which allowed JMI and its employees and agents access to inside information. As a result of that relationship, JMI and its employees and agents had access to material information about Cosential which would significantly affect the market price of its securities, was not generally available to the public, and which JMI and its employees and agents knew was not intended to be available to the public.

41.    As described above, Dan Cornish putatively transferred, purchased or otherwise acquired Series B Preferred shares from Mike Cornish and Kyle Cornish

42.    As described above, JMI and its employees and agents putatively transferred, purchased or otherwise acquired Series B Preferred shares from Mike Cornish and Kyle Cornish

43.    At the time Dan Cornish transferred, purchased, or otherwise acquired the Series B Preferred shares as described above, Dan Cornish knew that JMI had sought to acquire or invest in those shares for a much higher price.

- 46 -

Exhibit A

-56-

44.    At the time JMI Cornish transferred, purchased, or otherwise acquired the Series B Preferred shares as described above, JMI knew that JMI had sought to acquire or invest in those shares for a much higher price.

45.    The information possessed by Dan Cornish concerning Cosential was material information which would have significantly affected the market price of the Series B Preferred shares had it been generally available to the public

46.    The information possessed by JMI concerning Cosential was material information which would have significantly affected the market price of the Series B Preferred shares had it been generally available to the public

47.    At the time Dan Cornish purchased the Series B Preferred shares form Michael Cornish and Kyle Cornish s described above, the information possessed by Dan Cornish concerning Cosential was not generally available to the public.

48.    At the time JMI purchased the Series B Preferred shares form Michael Cornish and Kyle Cornish as described above, the information possessed by JMI concerning Cosential was not generally available to the public.

49.    At the time Michael Cornish and Kyle Cornish putatively transferred, sold, or gave the Series B preferred shares in Cosential to defendant as described above, Dan Cornish knew that the information possessed by Dan Cornish concerning Cosential was not intended to be generally available to the public.

50.    At the time Michael Cornish and Kyle Cornish putatively transferred, sold, or gave the Series B preferred shares in Cosential to defendant as described above, JMI knew that the information possessed by JMI concerning Cosential was not intended to be generally available to the public.

51.    Defendant Dan Cornish's conduct as described above was in violation of Corp. Code § 25402, which prohibits an officer of an issuer or a director of an issuer or other controlling person of issuer of security or other person whose relationship to issuer gives person access to inside information from purchasing or selling a security of the issuer in California at a time when he knows material information about the issuer gained from the relationship which

would significantly affect the market price of the security, which is not generally available to the public, and which he knows is not intended to be generally available to the public.

52.     To establish a claim for violation of § 25402, Mike Cornish has shown that Cosential issues the Series B Preferred Stock, that Dan Cornish was a corporate insider, that Dan Cornish purchased, acquired, received the Series B Preferred stock from Mike Cornish at a time when Dan Cornish knew material information about Cosential gained from his confidential relationship with Cosential that was not publically available, that the material information would materially effect the price of the shares, that the information was not public, that Dan Cornish knew the information was not public, that Mike Cornish suffered damages proximately caused by Dan Cornish's violation of California Corporations Code Section 25402.

53.     Defendant JMI's conduct as described above was in violation of Corp. Code § 25402, which prohibits a controlling person of issuer of security or other person whose relationship to issuer gives person access to inside information from purchasing or selling a security of the issuer in California at a time when he knows material information about the issuer gained from the relationship which would significantly affect the market price of the security, which is not generally available to the public, and which he knows is not intended to be generally available to the public.

54.     At the time Dan Cornish purchased, transferred, acquired the Series B Preferred shares in Cosential from Michael Cornish and/or Kyle Cornish as described above, the Series B Preferred shares would have had a market value of over eight million dollars if the information known to defendant had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

55.     Pursuant to the provisions of Corp. Code § 25502, Mike Cornish and Kyle Cornish are entitled to recover damages from Dan Cornish in an amount equal to the difference between the price at which the the Series B Preferred securities were sold and the market value which the *securities* would have had at the time of the *putative s* if the information known to defendant had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information, plus interest at the legal rate.

- 48 -

Exhibit A
-58-

56.     Pursuant to the provisions of Corp. Code § 25502.5, plaintiff is entitled to recover damages from defendant in an amount equal to three times the difference between the price at which the securities were sold and the market value which the securities would have had at the time of the purported transfer, acquisition, or sale if the information known to defendant had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

57.     Pursuant to the provisions of Corp. Code § 25502.5, plaintiff is also entitled to recover from defendant reasonable costs and attorney's fees in this action.

## FIFTEENTH CAUSE OF ACTION

### Rescission and Restitution

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

**58.**     Plaintiff incorporates and re-alleges every allegation set forth in paragraph above.

**59. Rescission of Prior Purported Agreements** There was no agreement between Mike and Dan to sell shares in the years before 2018. There were no contracts for sale of shares in 2011 or for subsequent shares. There is no evidence that the parties understood and agreed to the terms of the agreement, and there is no evidence that the parties agreed to be bound before a written agreement was completed and signed. None of the purported prior communication contained specific terms. Dan Cornish never made an offer to buy Mike's shares. Mike Cornish never accepted any offer to sell his shares. Mike never agreed to be bound by the terms of any purported prior offer. Dan never sent any adequate consideration to support any offer. To the extent that Dan alleges such agreements, they should be rescinded with full restitution.

**60. Rescission of Stock Ownership Agreement, Restitution of Shares,** The SOA was obtained by fraud, mistake, misrepresentations, duress, undue influence, unilateral mistake, bilateral mistake, and is subject to rescission with restitution of the shares.

- 49 -

Complaint

Exhibit A

-59-

**61.** <u>No formation</u>. No contract formation of the Stockholders Ownership Agreement because the parties did not agree to the terms of the contract. A reasonable person would not conclude that Mike gave away $9 million.

**62.** <u>Fraud</u>. Fraud - CACI 335, Civil Code Section 1572.

**63.** <u>Misrepresentation</u>

**64.** <u>Duress</u> - CACI 332, Civil Code Section 1569.

**65.** <u>Economic Duress</u> - CACI 333, Civil Code Section 1568.

**66.** <u>Undue Influence</u> - CACI 334, Civil Code Section 1575.

**67.** <u>Unilateral Mistake of Fact</u> - CACI 330; Civil Code Sections 1567,1577.

**68.** <u>Bilateral Mistake</u> - CACI 331, Civil Code Sections 1567, 1577.

**69.** <u>Unconscionability</u> is part of Rescission, see below.

## SIXTEENTH CAUSE OF ACTION

### Unjust enrichment

**70.**     Plaintiff incorporates and re-alleges every allegation set forth in paragraph 1-152.

**71.**     The elements for a claim of unjust enrichment include: receipt of a benefit and unjust retention of the benefit at the expense of another. (*Lectrodryer v. Seoul Bank* (2000) 77 Cal. App. 4th 723, 726.) Enrichment is unjust if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it. (*First Nationwide Savings v. Perry* (1992) 11 Cal. App. 4th 1657, 1662.)

**72.**     Defendants lied to Mike Cornish about the  benefit from the purchase, transfer , acquisition of the Series B Preferred shares at below market value

### SEVENTEENTH CAUSE OF ACTION
### <u>Unconscionable</u>

*(Against Daniel Cornish, Cosential, Cosential Entities, JMI, Does)*

- 50 -

**73.**   Plaintiff incorporates and re-alleges every allegation set forth in paragraphs above.

74.   The SOA is procedurally and substantially unconscionable as it was a nonnegotiable contract that contained egregious surprising and false terms that was procured by fraud, under mistake, duress, and lacked agreement on material terms. Mike had an absence of meaningful choice and the terms of the SOA were unreasonably favorable to Dan Cornish, Cosential, and JMI. The SOA and its clauses are the product of oppression, lack of negotiation, and lack of meaningful choice. Once discovered, Mike was utterly surprised regarding the truth of the terms. The real value of the shares was hidden and not disclosed even though Dan knew the real value. The SOA was a contract of adhesion where Mike was a party of lesser bargaining power who had no opportunity to negotiate, and Dan and Cosential knew material information that they knew Mike did not know and then exercised their ultimate power to terminate his employment and deny him the salary to support his family. The SOA basically took Mike's stock for free and reallocating risks in an objectively unreasonable or unexpected manner. The SOA was one-sidedness or overly harsh and should be deemed unenforceable. Since the price of no value is substantively oppressive and the ruse that Dan required Mike to sign now to save the company was the process, the SOA is unenforceable. The SOA should be rescinded with Dan and Cosential and JMI restituting the stock and the percentage ownership in the company and the value of the shares.

## PRAYER FOR RELIEF

*Wherefore, Mike Cornish and Kyle Cornish pray for a judgment against Defendants, Daniel Cornish, Cosential, Cosential Entities, and JMI and DOES 1-100, as follows:*

1.   Award damages in an amount to make each Plaintiff whole;

2.   Alternatively, grant Plaintiffs the right of rescission of the SOA and any other contract purporting to transfer the Series B shares and restitution with interest;

3.   Award consequential damages in Plaintiffs' favor, including expenses incurred;

4.   Award interest, in addition to any sums provided as restitution, relief, or other

Complaint

Exhibit A

-61-

recovery;

5.      Award any and all additional and further relief as is necessary to adjust the

equities between Michael Cornish, Kyle Cornish and Daniel Cornish, Cosential, Cosential

entities, JMI and to restore the pre-contract status quo. (*Civil Code*, §1692);

6.      Order an accounting;

7.      Award attorneys' fees, costs, and other relief, payable from Daniel Cornish and

Cosential directly, in addition to any sums that the defendants transfers as restitution, relief, or

other recovery, pursuant to the contract terms;

8.      Alternatively, award attorneys' fees, including an award of costs and attorneys'

fees to be made, including pursuant to contract terms;

9.      Award any and all additional and further relief as the Court may deem proper

/s

Dated: April 16, 2019              By:_____

John Jensen, Esq.
Attorney for Mike Cornish

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: April 16, 2019

s/

By:_____

John Michael Jensen, Esq. SBN 176813
Attorney for Plaintiffs

- 52 -

Complaint

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 11500 West Olympic Blvd., Ste. 550, Los Angeles, CA 90064.

On April 16, 2019, I served the following document by the method indicated below:

**COMPLAINT**

Said document was transmitted to the parties at the addresses listed below:

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on April 16, 2019, at Los Angeles, California.

_____

John Michael Jensen

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO** | | |
|---|---|---|
| STREET ADDRESS: | 330 W Broadway | |
| MAILING ADDRESS: | 330 W Broadway | |
| CITY AND ZIP CODE: | San Diego, CA 92101-3827 | |
| BRANCH NAME: | Central | |
| TELEPHONE NUMBER: | (619) 450-7075 | |

| PLAINTIFF(S) / PETITIONER(S): | Kyle Cornish et.al. |
|---|---|
| DEFENDANT(S) / RESPONDENT(S): | Daniel Cornish et.al. |

CORNISH VS CORNISH [IMAGED]

| **NOTICE OF CASE ASSIGNMENT**<br>**and CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>37-2019-00019692-CU-FR-CTL |
|---|---|

## CASE ASSIGNMENT

Judge:  Richard E. L. Strauss                          Department: C-75

**COMPLAINT/PETITION FILED:** 04/16/2019

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 01/10/2020 | 10:15 am | C-75 | Richard E. L. Strauss |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS: Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES: In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

COURT REPORTERS: Court reporters are not provided by the Court in Civil cases. See policy regarding normal availability and unavailability of official court reporters at www.sdcourt.ca.gov.

*ALTERNATIVE DISPUTE RESOLUTION (ADR): THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

SDSC CIV-721 (Rev. 01-17)

Page: 1

**NOTICE OF CASE ASSIGNMENT**

Exhibit A

-64-



# Superior Court of California
## County of San Diego

# NOTICE OF ELIGIBILITY TO eFILE
# AND ASSIGNMENT TO IMAGING DEPARTMENT

**This case is eligible for eFiling. Should you prefer to electronically file documents, refer to General Order in re procedures regarding electronically imaged court records, electronic filing, and access to electronic court records in civil and probate cases for rules and procedures or contact the Court's eFiling vendor at www.onelegal.com for information.**

**This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed. Original documents should not be filed with pleadings. If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).**

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program"). As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file. The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150. The paper filing will be imaged and held for 30 days. After that time it will be destroyed and recycled. **Thus, you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806.** Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words **"IMAGED FILE"** in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

Page: 2

Exhibit A

-65-